```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA

                       Alexandria Division

CHARLES R. LUESSENHOP,       )
                             )
     Petitioner,             )
                             )
          v.                 )    Criminal Action No. 02-298
                             )    Civil Action No. 03-458
UNITED STATES OF AMERICA,    )
                             )
     Respondent.             )
```

## **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The Court conducted an evidentiary hearing at which the government moved to dismiss Petitioner's § 2255 motion at the close of Petitioner's case-in-chief. After reviewing the evidence presented by Petitioner and having the opportunity to observe the credibility and demeanor of Petitioner's witnesses, the Court will grant the government's motion to dismiss.

### I.  Background

On May 10, 2002, Petitioner, Charles Luessenhop, appeared before this Court and entered a preindictment plea of guilty to a one-count criminal information alleging a conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The plea was based on false statements made for the purpose of obtaining mortgages insured by the United States Department of Housing and Urban Development ("HUD") on two real estate

properties.[1]  When the buyers of these properties defaulted, HUD paid the mortgages and resold the properties.  No loss amount was stipulated in Petitioner's plea agreement.

At the sentencing hearing, Petitioner's former counsel, James C. Clark, argued that the loss amount established in the presentence report was not reasonably foreseeable to Petitioner.  Clark's argument was based on the fact that HUD resold the two properties at issue at amounts that were below market value.  The Court rejected this contention under *United States v. McCoy*, 242 F.3d 399, 404 (D.C. Cir. 2001), which held that the loss calculation from a fraudulent Small Business Administration ("SBA") loan application should be based on the actual sale price of the collateral and not the alleged potential sale price.  The Court then calculated a loss amount of $223,816.77 by starting with the amount of money paid by HUD to satisfy the mortgages, subtracting the amount HUD recouped through resale of the properties, and adding fees incurred.[2]  The resale prices had been set by HUD as a result of two appraisals.

Petitioner then filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  On July 19, 2004, this Court denied the motion, holding, *inter alia*, that the

---

[1] The two properties are located at 1509 G Street, S.E., Washington, D.C. (hereinafter "the G Street property") and 815 K Street, N.E., Washington, D.C. (hereinafter "the K Street property").

[2] The $223,816.77 constituted the amount of Petitioner's restitution obligation in this case, which he has satisfied.

government did not fail to produce exculpatory evidence, that Clark did not provide ineffective assistance of counsel in advising Petitioner to plead guilty, and that Clark did not provide ineffective assistance of counsel at the sentencing stage. *See United States v. Luessenhop*, No. 02-298, slip op. (E.D. Va. July 19, 2004). The Fourth Circuit vacated this Court's July 19, 2004 Order in part, remanding for an evidentiary hearing on Petitioner's claim that he received ineffective assistance of counsel at sentencing. *United States v. Luessenhop*, 143 Fed. Appx. 528, 531 (4th Cir. 2005). The Fourth Circuit denied a certificate of appealability as to each of Luessenhop's other claims. *Id.* at 529.

Petitioner's claim of ineffective assistance of counsel at sentencing is premised on Clark's failure to argue the applicability of an exception to the *McCoy* rule. Specifically, Petitioner claims that Clark should have argued that the resale prices of the K Street and G Street properties were artificially depressed because of sham transactions or fraud. On February 27, 2006, the Court conducted an evidentiary hearing on Petitioner's claim. At the conclusion of Petitioner's case-in-chief, the government moved to dismiss Petitioner's § 2255 motion, arguing that Petitioner's evidence was insufficient to establish ineffective assistance of counsel. The government's motion to dismiss is currently before the Court.

## II.  Standard of Review

In a bench trial, the Court bears the responsibility of weighing the evidence, determining the credibility of the witnesses, and finding the facts.  *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987).  The Court may select among conflicting inferences to be drawn from the witnesses' testimony.  *Id.*  A motion challenging the sufficiency of the evidence must be treated the same in a bench trial as it would be in a jury trial.  *See United States v. Gebow*, No. 91-41, 1992 U.S. Dist. LEXIS 2, *19 (S.D.N.Y. Jan. 2, 1992).  The question is whether a reasonable factfinder could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  Findings of Fact

The appraisals and resales that are the subject of Petitioner's § 2255 motion occurred pursuant to HUD regulations and guidelines.  When a residential property whose mortgage has been insured by the Federal Housing Authority ("FHA") goes into default, HUD pays the balance owed to the mortgage holder and takes ownership of the residential property.  HUD refers to such properties as Real Estate Owned ("REO") properties and markets such properties for resale through its REO Division.  The REO Division enters into contracts, referred to as Marketing and

Management ("M & M") Contracts, with private real estate companies ("M & M contractors").

Under the terms of these contracts, the M & M contractor must hire a HUD-approved appraiser to appraise the value of the REO property before it is listed for resale. HUD provides the contractor with a list of HUD-approved appraisers, but the contractor usually has the discretion to choose any appraiser on the HUD list. After obtaining an appraisal, the M & M contractor advertises the REO property for sale and a bidding process ensues. Generally, the highest net bid that meets or exceeds the appraised price is awarded the sales contract. HUD gives a preference to bidders who indicate that they are seeking to purchase the property to use as their primary residence.

First Preston Management Company ("First Preston") was the M & M contractor that handled the resale of the K Street property. The M & M contract between HUD and First Preston required First Preston to employ a HUD-approved appraiser who was licensed in Washington, D.C. to appraise the K Street property. HUD entered into a similar M & M contract with In-Town Management Group ("In-Town") for the resale of the G Street property. After obtaining the appraisal and listing the K Street property for resale, First Preston awarded a sales contract to an individual named Claude Jackson. On April 19, 2000, HUD conveyed the K

Street property to Jackson for $60,500.  In-Town conveyed the G Street property on January 28, 2000 to an individual named Theodore Powell for $109,000.

The appraisal of the K Street property was purportedly conducted and signed by an individual named Winfield Willis, a HUD-approved appraiser licensed in Washington, D.C.  Willis testified, however, that the appraisal was actually performed by an individual named Keith Patterson, a HUD-approved appraiser who was licensed in Maryland but was not licensed, at the time, in the District of Columbia.  Although Patterson signed Willis's name to the appraisal, Willis never actually saw the K Street property or reviewed the appraisal.  Willis and Patterson had the same arrangement with respect to the G Street property.  Neither Willis nor Patterson informed anyone at HUD about this arrangement.

Patterson appraised the K Street property in November 1999.  He conducted his appraisal by examining public records regarding the property, measuring the property to ensure consistency with the public records, assessing damage to the house, and considering the values of comparable properties.  Ultimately, Patterson valued the K Street property at $63,000.  Patterson was unaware that the property had sold for $165,000 only two years prior to his appraisal and did not consider this

fact in valuing the property.[3] Patterson did note that the K Street property suffered from damage in several places. Specifically, there was water damage from a leak in the basement, windows were broken, the kitchen in one of the building's units needed rehabilitation, and the carpet needed to be replaced. Based on this damage, Patterson listed the property in "fair" condition and took the damage into account in reaching his valuation of $63,000.[4]

In December 1999, Claude Jackson entered into a sales contract for the K Street property, purchasing the property for $60,500 on April 19, 2000. Jackson did not provide a down payment for the property. In an addendum to the sales contract, Jackson certified that he intended to occupy the property as his primary residence for at least twelve months. (Pet'r Ex. 9.) Despite this certification, Jackson never occupied the property and entered into a contract on June 24, 2000 to sell the K Street property for the amount of $179,950.00.[5] Despite the fact that

---

[3] Patterson testified that resale history would typically be listed on public records pertaining to a property and that he would take a property's publicly listed resale history into account. He attributed his lack of knowledge of the K Street property's resale history to a backlog in the District of Columbia public record system.

[4] In response to the government's questioning, Patterson testified that he did not accept money from anyone to artificially deflate the value of the K Street property. After having the opportunity to observe Patterson's credibility and demeanor, the Court will credit his testimony.

[5] Jackson testified that a man whose name he could not remember made him aware of the K Street property and assisted him in the purchase. The same man located a buyer for the property when Jackson sought to sell it.

he sold the property for almost three times the amount of his purchase price only two months after purchasing it, Jackson testified that he did not recall selling the property for this amount.

Jackson also testified that he received no money whatsoever from the sale. In contrast, the Settlement Statement from this transaction (hereinafter "HUD-1") shows that Jackson received $488 from the sale of the K Street property. According to the HUD-1, a man named John Austin received $26,058.34, an attorney named Michael Perry received $10,443.71, and $120,000.00 was transmitted to a company named Mid Atlantic Settlement Services ("Mid-Atlantic"), which was the settlement agent. Implausibly, Jackson could not recall who John Austin was, why Michael Perry received a fee of $10,443.71 for serving as the closing attorney, and why Mid-Atlantic received the lion's share of the proceeds.[6] Further contradicting Jackson's insistence that he received no money was a disbursement statement from Mid-Atlantic's escrow account at Southern Financial Bank. (Pet'r Ex. 25.) The statement shows that Jackson received a check on August 4, 2000 for the amount of $9,300.00.

---

[6]Perry, who testified in this case, also could not recall the transaction, even though he characterized the amounts received by himself and Mid-Atlantic as "not normal." At the time of the transaction, Perry was the sole owner of Mid-Atlantic.

**IV. Analysis**

A. Ineffective Assistance of Counsel - Standard of Review

Under 28 U.S.C. § 2255, a person may attack his sentence on four grounds: (1) that the sentence was imposed in violation of the Constitution or the laws of the United States, (2) that the court was without jurisdiction to impose the sentence, (3) that the sentence was in excess of the maximum authorized by law, or (4) that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *see also Hill v. United States*, 368 U.S. 424, 426-27 (1962). To prevail under § 2255, the movant bears the burden of proof by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

Claims of ineffective assistance of counsel may give rise to a constitutional issue cognizable under 28 U.S.C. § 2255. *See United States v. Fisher*, 477 F.2d 300, 302 (4th Cir. 1973). To prove that ineffective assistance of counsel violates the Sixth Amendment, a petitioner must satisfy a two-pronged test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also Bell v. Evatt*, 72 F.3d 421, 427 (4th Cir. 1995), *cert. denied sub nom. Bell v. Moore*, 518 U.S. 1009 (1996). A petitioner must show that "(1) his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) 'there is a

reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bell*, 72 F.3d at 427 (quoting *Strickland*, 466 U.S. at 688). If a petitioner fails to meet either requirement, his claim for ineffective assistance of counsel fails. *Strickland*, 466 U.S. at 697. Furthermore, if a petitioner fails to make a sufficient showing on one prong of the test, the Court is not obliged to address the other prong. *Id.* at 700.

As to the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has elaborated on the deference due to counsel's performance, explaining that:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* (quotation marks and internal citations omitted).

Petitioner carries a heavy burden under the second prong of the *Strickland* test. The essence of the Sixth Amendment guarantee is "to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. In accord with this principle, Petitioner must

establish that any deficiency in counsel's performance was prejudicial to him. *Id.* at 692. Prejudice exists only where "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). In reviewing a claim of prejudice, the Court must therefore determine whether the results of the proceedings were fundamentally unfair or unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

B.  Petitioner's Evidence

Petitioner's ineffective assistance of counsel claim relies on the fact that his former attorney, James Clark, did not press an argument based on the exception to the *McCoy* rule at Petitioner's sentencing hearing. According to Petitioner, had Clark made an argument under the *McCoy* exception, the Court would have disregarded the actual amounts that HUD recouped through the resales of the K Street and G Street properties. This, in turn, would have led to a lesser result in the Court's loss calculation.

Under the exception to the *McCoy* rule, the actual sale price of the collateral is not an appropriate basis for a loss calculation where the weight of the evidence suggests that the liquidation sales were not at arms length or were the result of fraud or misconduct. *See McCoy*, 242 F.3d at 404. In *McCoy*, the

-11-

D.C. Circuit held that the district court properly used the actual sale price of the collateral as the basis for its loss calculation.  In reaching this holding, the D.C. Circuit emphasized the lack of evidence "that the liquidation sale was a sham, or that the SBA artificially depressed the value of the recovery."  *Id.*  This language contemplates some sort of complicity on the part of the government agency.  *See also Luessenhop*, 143 Fed. Appx. at 530 (reading *McCoy* to require loss calculations to be based on the collateral's actual sale price, "absent fraud on the part of the Government").  Thus, in the instant case, Petitioner must establish:  1) that the appraisals of the properties at issue were not at arms-length, were the result of fraud or misconduct, or were otherwise a sham; and 2) that the fraud or misconduct was somehow attributable to HUD.  If Petitioner cannot establish that these deficiencies infected the resale prices on which the Court based its loss calculation, then the Court cannot say that Clark's performance fell beneath an objective standard of reasonableness or that Petitioner was prejudiced by Clark's failure to argue applicability of the *McCoy* exception.  *See Strickland*, 466 U.S. at 688.

   Petitioner cites several improprieties and irregularities that occurred during the resale process as evidence that the appraisals and resales were fraudulent.  First, Petitioner points to the fact that Keith Patterson conducted the

appraisals at a time when he was not licensed to do so in Washington, D.C.  Petitioner also cites the arrangement between Patterson and Winfield Willis, by which Patterson would sign Willis's name to his appraisals to mask the fact that he was conducting appraisals in Washington, D.C. without a license. While these facts may constitute violations of the pertinent HUD regulations and the District of Columbia licensure requirements, they do not amount to a fraudulent action that artificially depressed the appraisal values of the properties.  More importantly, there is no evidence to suggest that HUD was aware of the arrangement between Willis and Patterson.

   Second, Petitioner argues that Patterson's appraisal dramatically undervalued the K Street property and that such constituted fraud.  Petitioner called Patterson's valuation into question through the testimony of Colleen Morrison, a real estate appraiser who testified as an expert witness.[7]  After reviewing Patterson's appraisals in October of 2002, Morrison concluded that the appraisals had not been completed in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"). Morrison pointed to the USPAP ethics rule, which prohibits appraisers from communicating assignment results "in a misleading or fraudulent manner."  (Pet'r Ex. 20.)  On cross-examination,

---

[7] While Morrison estimated that Patterson undervalued the G Street property by approximately thirty percent, Petitioner's evidence on the valuation issue focused primarily on the K Street property.  Consequently, the following discussion will center on the K Street property.

-13-

however, Morrison conceded that she found Patterson's appraisal of the K Street property merely "confusing" and that she found no evidence that it was communicated in a fraudulent matter. Morrison also testified that Patterson's appraisals violated USPAP Rule 1-5, which requires an appraiser to analyze any current agreement of sale, option, or listing of the property as well as any prior sales of the property that occurred within the previous year.  (Pet'r Ex. 20.)  Morrison admitted, however, that HUD issued her a sanction letter in April 2002 accusing her of violating USPAP Rule 1-5, and she declined to characterize Patterson's violation of the same rule as fraud.

      Morrison conducted a further review of the appraisals in December 2002, estimated the value of the K Street property at $152,000, and concluded that Patterson's appraisal undervalued the property by approximately 125 percent.  Morrison's opinion of Patterson's valuation was based, in part, on a conclusion that the comparable properties used by Patterson were inferior to the K Street property.  Morrison did not, however, physically inspect the K Street property or the comparable properties used by Patterson.

      Morrison's valuation was also based on several faulty assumptions.  Her report provided that "[i]f any of these assumptions turn out to be different than that reported herein, the final opinions of value could be altered."  (Pet'r Ex. 21.)

First, Morrison relied on an assumption that the K Street property was in "average" condition.  In this regard, Morrison's appraisal rested on a fundamentally different premise than that of Patterson, who, after actually inspecting the property, assessed it to be in "fair" condition.  Second, Morrison worked from an assumption that the K Street property had been fully renovated in 1995, before it was sold to Doris Davis in 1997.  Davis's March 19, 2002 testimony before a grand jury belied this assumption.  According to Davis, the plumbing in both units of the K Street property needed repair, as well as the upper unit's hot water heater and several appliances.  Davis further testified that the basement unit was uninhabitable due to water leakage and a problem with the heating.  Thus, Morrison was incorrect in assuming that the K Street property was in fully renovated condition.

      Morrison selected three comparable properties that were not used by Patterson in appraising the K Street property.  Morrison's selections did not, however, comport with HUD standards for appraisals of REO property.  HUD requires appraisers to use sales comparables from other REO transactions if comparables are available that are similar to the property being appraised.  If such comparables are unavailable, the appraiser may then rely on regular market comparables.  The comparables used by Morrison were all regular market properties.

While Morrison felt that the comparables used by Patterson were inferior to the K Street property, she never determined whether other REO sales were available to serve as comparables.

In sum, Morrison based her valuation on two faulty assumptions, failed to comply with the HUD standard for selecting comparable properties, and never opted to physically inspect the K Street property or Patterson's comparables.  Because of the extent to which Morrison was impeached, the Court finds her to not be a credible witness.  Given the numerous issues underlying her valuation of the K Street property, the Court considers her valuation to be highly suspect and will not find Patterson's appraisal to be fraudulent based on a comparison with Morrison's appraisal.  There is no other evidence relating to the valuation that would suggest that Patterson fraudulently depressed the value of the K Street property or that HUD was complicit in such conduct.

Third, Petitioner points to the circumstances surrounding the liquidation sale of the K Street property to Claude Jackson.  To review, Jackson purchased the property for $60,500 on April 19, 2000.  Jackson certified that he intended to occupy the property as his primary residence for at least twelve months.  Despite this, he turned around and sold the property two months later for nearly triple the amount of his purchase price.  In spite of the enormous profit one would expect, Jackson

maintained that he received no money from the transaction and did not remember who received the money.  Likewise, Jackson's closing attorney could not recall the transaction, although he received an unusually high fee, as did his company.  Finally, Jackson's account was contradicted by both the HUD-1 settlement statement and by a disbursement statement from the escrow account of Jackson's settlement company.

Needless to say, the resale of the K Street property was a transaction teeming with circumstantial evidence indicative of fraud.  Nevertheless, there is no evidence to suggest that any such fraud affected Patterson's appraisal of the K Street property or the price at which the property was sold to Jackson on April 19, 2000.  Similarly, there is no evidence of HUD complicity in the fraudulent scheme, if one existed.  Absent such evidence, there would be no reason to press an argument based on the *McCoy* exception.

During the evidentiary hearing in this matter, James Clark testified about his reasons for declining to pursue the *McCoy* exception at Petitioner's sentencing.  Clark stated that he weighed the possibility of pressing the *McCoy* exception against a strategy of diminishing Petitioner's sentence by providing assistance to the government and procuring a motion for reduction of sentence under § 5K1.1 of the United States Sentencing Guidelines.  As for the reasons why he opted for the latter

strategy, Clark stated that, "I think the conclusion that we came to was that there was a risk involved in exploring the fraud angle in that it may discourage the U.S. Attorney's office from giving us a 5(k)." (Tr. of Feb. 27, 2006 Evidentiary Hr'g at 146.) Clark's decision was clearly a matter of trial strategy, and a sound decision at that, given that the government did file a § 5K1.1 motion in Petitioner's case. As such, the Court cannot say that Clark's conduct fell below the objective standard of reasonableness that *Strickland* contemplates. *See Strickland*, 466 U.S. at 688.

Moreover, given the lack of evidence of fraudulent conduct that depressed the resale prices of the K Street and G Street properties and the complete paucity of evidence indicating any complicity by HUD, it is clear that Clark's decision did not result in prejudice to Petitioner. Clark himself highlighted the crux of the matter:

> The issue, I think, that I would have been focused on if I was going the direction that Mr. Luessenhop takes in the [§ 2255] petition is whether there was fraud on the part of [the] Department of Housing and Urban Development or not.

(Tr. of Feb. 27, 2006 Evidentiary Hr'g at 138.) The complete lack of evidence of fraud on the part of HUD confirms that Clark made the correct decision in declining to pursue the *McCoy* exception. As Petitioner cannot establish that he would have been entitled to avail himself of the *McCoy* exception, it is

inconceivable that Clark's decision "so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374.  Because Clark's trial strategy was objectively reasonable, and because this strategy did not result in prejudice to Petitioner, the Court finds that Petitioner did not receive ineffective assistance of counsel at his sentencing proceedings.

### V.   Conclusion

For the foregoing reasons, the Court will grant the government's motion to dismiss Petitioner's § 2255 motion.  An appropriate Order shall issue.


March 28, 2006                          _____/s/_____
Alexandria, Virginia                    UNITED STATES DISTRICT COURT JUDGE